UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEBASTIAN CHAVARRIAGA ROJAS, et al., | Case No. 25-cv-08172-PCP |
| Plaintiffs, | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| v. | Re: Dkt. No. 6 |
| SERGIO ALBARRAN, et al., | |
| Defendants. | |

Petitioners Sebastian Chavarriaga Rojas, Maria Camila Gomez Vasquez, Leon Felipe Hernandez Leal, and Julian David Carvajal Mendoza are asylum-seekers who each arrived in the United States in the last two years and have lived in California since that time. On September 25, 2025—as part of a nationwide practice that courts across the country have consistently and overwhelmingly held is likely unconstitutional—agents of Immigration and Customs Enforcement (ICE) arrested petitioners as they were leaving immigration court in San Francisco and detained them without first providing them with a hearing to determine whether they posed a flight risk or a danger to the community. Petitioners filed a writ of habeas corpus, arguing that ICE's conduct violated their procedural and substantive due-process rights under the Fifth Amendment. On the day of their arrests, this Court issued a temporary restraining order requiring the government to release petitioners and enjoining it from re-detaining them without notice and a pre-detention hearing before a neutral decisionmaker. The Court also ordered the government to show cause why a preliminary injunction should not issue in favor of petitioners. For the reasons set forth below, the Court issues the requested preliminary injunction.[1]

_____

[1] The parties previously stipulated to extend the temporary restraining order's effect beyond the default 28-day period provided by the Federal Rules based on the recent federal government shutdown.

United States District Court
Northern District of California

1

2    **STATUTORY FRAMEWORK**

3        Two statutes—8 U.S.C. §§ 1225 and 1226—provide for the detention of noncitizens (or

4    "aliens") pending removal proceedings.

5        Under § 1225, a noncitizen "who 'arrives in the United States,' or 'is present' in this

6    country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings v.*

7    *Rodriguez*, 583 U.S. 281, 287 (2018) (quoting 8 U.S.C. § 1225(a)(1)). All noncitizens "who are

8    applicants for admission" or who are "otherwise seeking admission or readmission to or transit

9    through the United States[,] shall be inspected by immigration officers" to assess whether they

10   may be admitted into the country. 8 U.S.C. § 1225(a)(3). An inspecting officer must then

11   determine whether an applicant for admission is covered by either § 1225(b)(1) or § 1225(b)(2).

12   *See Jennings*, 583 U.S. at 287. Section 1225(b)(1) applies to noncitizens who, upon arriving, are

13   initially deemed inadmissible under 8 U.S.C. § 1182(a)(6)(C) or (a)(7) due to fraud,

14   misrepresentation, or lack of valid documentation. *See* 8 U.S.C. § 1225(b)(1)(A)(i). It also applies

15   to certain noncitizens designated by the Secretary of Homeland Security who are later determined

16   to be inadmissible under § 1182(a)(6)(C) or (a)(7) and were not continuously present in the United

17   States for the two-year period prior to that determination. *See id.* § 1225(b)(1)(A)(iii).[2] Section

18   1225(b)(2) covers all other "applicant[s] for admission" who are "seeking admission," with

     limited exceptions not applicable here. *See id.* § 1225(b)(2)(A)–(B).

19       Subsections (b)(1) and (b)(2) both authorize detention pending removal proceedings in

20   certain circumstances. Noncitizens covered by § 1225(b)(1) are subject to an expedited removal

21   process and will be "removed from the United States without further hearing or review" unless

22   they claim a right to asylum. *Id.* § 1225(b)(1)(A)(i)–(ii). If a noncitizen states an intent to apply for

23   asylum and an immigration officer determines that there is a credible fear of prosecution, the

24   noncitizen "shall be detained for further consideration of the application for asylum." *Id.*

25

26   _____

27   [2] The authority to designate groups of noncitizens for expedited removal "once belonged to the
     Attorney General, who is still named in the statute," but has since been transferred to the Secretary
28   of Homeland Security. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 109 n.3
     (2020) (citing 6 U.S.C. § 251(2)).

United States District Court
Northern District of California

§ 1225(b)(1)(B)(ii). Noncitizens covered by § 1225(b)(2) are not subject to expedited removal. Instead, they are placed in standard removal proceedings under 8 U.S.C. § 1229a, which include an evidentiary hearing before an immigration judge, the right to counsel, and the right to seek review by the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.* § 1225(b)(2)(A); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020); *see also Valencia Zapata v. Kaiser*, 2025 WL 2741654, at *1 (N.D. Cal. Sept. 26, 2025). Section 1225(b)(2) mandates that noncitizens "shall be detained" pending such proceedings unless they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). "In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending." *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503, at *3 (N.D. Cal. Sept. 12, 2025). DHS may release noncitizens detained under either § 1225(b)(1) or (b)(2) only on temporary parole "for urgent humanitarian reasons or significant public benefit." *Jennings*, 583 U.S. at 300; *see* 8 U.S.C. § 1182(d)(5)(A). By regulation, release is available only where "the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b).

For noncitizens who are "already in the country," § 1226 authorizes detention "pending the outcome of removal proceedings" in certain circumstances. *Jennings*, 582 U.S. at 289. Unlike § 1225(b)(1) and (b)(2), § 1226(a) affords the government significant discretion. After arresting a noncitizen "[o]n a warrant," the government "may continue to detain the arreste[e]" until a final removal decision is made or "may release" them on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(1)–(2). As under § 1225(b)(1) and (b)(2), however, release is available only if "the alien … demonstrate[s] to the satisfaction of [an] officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8). If a noncitizen wishes to contest the initial custody determination— i.e., the denial or amount of bound—they have a right to do so before an immigration judge. 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1). Immigration judges must deny bond unless "an alien … demonstrate[s], by clear and convincing evidence, that release would not pose a danger to other persons or to property" and "that the alien is likely to appear for any scheduled proceeding or

1    interview." 8 C.F.R. § 1003.19(h)(3). Just as § 1226(a) grants DHS discretion to release covered

2    noncitizens, § 1226(b) permits DHS to revoke bond or parole "at any time." 8 U.S.C. § 1226(b).

3        In a handful of circumstances, § 1226(c) departs from § 1226(a)'s discretionary framework

4    to mandate detention of noncitizens who are already in the country. *See* 8 U.S.C. § 1226(c). The

5    government "shall take into custody" noncitizens who are inadmissible or deportable because they

6    committed certain criminal offenses, *id.* § 1226(c)(1)(A)–(C); are inadmissible based on terrorist

7    affiliations or other security concerns, *id.* § 1226(c)(1)(D); or are inadmissible on certain bases and

8    have been charged, arrested, or convicted for specific crimes, including burglary and shoplifting,

9    *id.* § 1226(c)(E). Section 1226(c) authorizes the release of such noncitizens only if the government

10    deems it necessary for witness-protection purposes and finds that "the alien will not pose a danger

11    to the safety of other persons or of property and is likely to appear for any scheduled proceeding

12    …" *See* 8 U.S.C. § 1226(c)(4).

13                                **FACTUAL BACKGROUND**

14        Mr. Chavarriaga Rojas is 30-year-old asylum-seeker from Colombia. Petition at 2. After he

15    entered the United States at San Ysidro, California, around March 4, 2024, Border Patrol agents

16    apprehended and transported him to a nearby facility for processing. DHS served him with an

17    arrest warrant, a notice to appear deeming him inadmissible, and an order for release on his own

18    recognizance. Opposition at 7-8. Mr. Chavarriaga Rojas appeared at his first master calendar

19    hearing and his case was continued to September 25, 2025. On September 25, 2025, DHS moved

20    to dismiss the pending removal proceedings in order to initiate expedited removal. The presiding

21    immigration judge continued the hearing to give him an opportunity to respond. After the hearing,

22    ICE took Mr. Chavarriaga Rojas into custody.

23        Ms. Gomez Vasquez is a 23-year-old asylum-seeker from Colombia. After she entered the

24    United States at San Ysidro, California around March 4, 2024, Border Patrol agents apprehended

25    and transported her to a nearby facility for processing. DHS served Ms. Gomez Vasquez with an

26    arrest warrant, a notice to appear that found her inadmissible, a notice of custody determination,

27    and an order for release on her own recognizance. Opposition at 8. On February 21, 2025, Ms.

28    Gomez Vasquez requested to consolidate her proceedings with those of Mr. Chavarriaga Rojas.

United States District Court
Northern District of California

On May 1, 2025, she attended her first master calendar hearing, and her case was continued to September 25, 2025. On September 25, 2025, DHS moved to dismiss her removal proceedings in order to initiate expedited removal. The Immigration Judge continued the hearing to give Ms. Gomez Vasquez an opportunity to respond. After the hearing, ICE took Ms. Gomez Vasquez into custody.

Mr. Hernandez Leal is a 26-year-old asylum-seeker from Colombia. After he entered the United States at San Ysidro, California, around December 13, 2023, Border Patrol agents apprehended him and transported him to a facility for processing. DHS processed Mr. Hernandez Leal and served him with an arrest warrant, a notice to appear that found him inadmissible, a notice of custody determination, and an order for release on his own recognizance. On September 25, 2025, Mr. Hernandez Leal appeared at his first master calendar hearing. DHS counsel moved to dismiss the removal proceedings in order to initiate expedited removal. The presiding immigration judge continued the hearing in order to give Mr. Hernandez Leal time to respond. After the hearing, ICE took Mr. Hernandez Leal into custody. Opposition at 8-9.

Mr. Carvajal Mendoza is a 29-year-old asylum-seeker from Colombia. Mr. Carvajal Mendoza entered the United States at San Ysidro, California, around December 13, 2023. DHS processed Mr. Carvajal Mendoza and served him with an arrest warrant, a notice to appear that found him inadmissible, a notice of custody determination, and an order for release on his own recognizance. On September 25, 2025, Mr. Carvajal Mendoza appeared at his first master calendar hearing, wherein DHS counsel moved to dismiss the removal proceedings in order to initiate expedited removal. The immigration judge continued the hearing, after which ICE took Mr. Carvajal Mendoza into custody.

## LEGAL STANDARD

To procure a preliminary injunction, petitioners must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of

5

1  success on the merits—then a preliminary injunction may still issue if 'the balance of hardships

2  tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied.'" *All. for the*

3  *Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v.*

4  *Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "Where, as here, the party opposing

5  injunctive relief is a government entity, the third and fourth factors—the balance of equities and

6  the public interest—merge." *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025)

7  (citation modified).

## ANALYSIS

9  This Court ordered the United States to show cause why a preliminary injunction should

10 not issue in favor of petitioners. For the reasons set forth below, the Court concludes that

11 petitioners are likely to succeed on the merits of their procedural due-process claim, are likely to

12 suffer irreparable harm absent an injunction, and have established that both the balance of equities

13 and public interest favor granting injunctive relief. The Court therefore grants the requested

14 preliminary injunction.

**I.    Petitioners are likely to succeed on the merits of their claim.**

16 The Due Process Clause protects all persons in the United States, including noncitizens,

17 from deprivations "of life, liberty, or property" by the federal government "without due process of

18 law[.]" U.S. Const. amend. V; *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Freedom

19 from imprisonment—from government custody, detention, or other forms of physical restraint—

20 lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. The Supreme Court

21 has held that noncitizens who are "on the threshold" of entering the country and "seeking initial

22 entry" are not entitled to the full range of constitutional due process rights available under the

23 Fifth Amendment. *Thuraissigiam*, 591 U.S. at 139–40. But noncitizens "who have established

24 connections in this country [beyond merely entering the United States] have due process rights in

25 deportation proceedings." *Id.* at 107. Merely "set[ting] foot on U.S. soil" is not sufficient to

26 "effect[] an entry" triggering due-process protections for admissions decisions if a noncitizen is

27 detained shortly thereafter. *Id.* at 139–40. But if a noncitizen "gain[s a] foothold in the United

28 States," *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), or "begins to develop … ties" in this country,

United States District Court
Northern District of California

their "constitutional status changes accordingly," and they "ha[ve] a right to due process," *Landon v. Plasencia*, 459 U.S. 21, 32–33 (1982); *see also Yamataya v. Fisher*, 189 US. 86, 100–01 (1903) (distinguishing noncitizens entitled to due process from those "who ha[ve] been here for too brief a period to have become, in any real sense, a part of our population"). Put another way, "[noncitizens] who have established connections in this country have due process rights in deportation proceedings[.]" *Thuraissigiam*, 591 U.S. at 107.

Petitioners have clearly "established connections in this country," *id.*, sufficient to make them "part[s] of our population," *Yamataya*, 189 U.S. at 101. Each petitioner has resided in the United States for nearly two years, which is certainly long enough to "begin[] to develop … ties" and become "a part of our population." *See Pablo Sequen v. Kaiser*, No. 25-cv-06487-PCP, 2025 WL 2650637, at *5 (N.D. Cal. Sept. 16, 2024). Petitioners were not "on the threshold" of entering the country when they were arrested in September. They were instead complying with their obligations to the United States while also continuing to build connections within this country. Petitioners are therefore entitled to due process under the Fifth Amendment.

The INA provides as a statutory matter that "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). But even where the government has the statutory discretion to detain an individual, its subsequent decision to release the individual after having detained them creates "an implicit promise" that they will be re-detained only if they violate the conditions of their release. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Such conditional release "is valuable and must be seen as within the protection of the [Due Process Clause]." *Id.* at 482. Here, after briefly detaining each petitioner upon their initial arrival into the United States, the government released them on their own recognizance subject to certain conditions. Courts in this district consistently hold that when a noncitizen is released pending civil removal proceedings, the noncitizen has a protected liberty interest in remaining out of immigration custody. *See, e.g.*, *Roa v. Albarran*, No. 25-cv-07802-RS, 2025 WL 2732923, at *5 (N.D. Cal. Sept. 25, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-cv-06248-BLF, 2025 WL 2419263, at *6 (N.D. Cal. Aug. 21, 2025); *Guillermo M. R. v. Kaiser*, No. 25-cv-05436-RFL, 2025 WL

1983677, at *4 (N.D. Cal. July 17, 2025).

Accordingly, petitioners' protected liberty interest in remaining out of immigration custody could be taken away only if the government's procedure for doing so accorded with due process.[3] The Supreme Court's test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), establishes three factors that must be balanced in determining what procedures due process requires with respect to the deprivation of a protected interest:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probably value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Each of these three factors supports the conclusion the petitioners are entitled to a hearing before a neutral decisionmaker before they are re-detained.[4]

### A.    Petitioners' private interest is substantial.

Petitioners have a substantial interest in remaining out of custody. The liberty of

---

[3] The Ninth Circuit has held that a noncitizen's initial detention pursuant to § 1226 generally satisfies due process notwithstanding that the noncitizen has an opportunity to contest the basis for detention only after the noncitizen has already been arrested and detained. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1210–12 (9th Cir. 2022). But *Rodriguez Diaz* did not consider the circumstances presented here, which involve not the government's initial detention of a noncitizen but the government's subsequent decision to re-detain that noncitizen having previously determined that they posed no flight risk or threat to the community. Because that prior determination both constitutes an implicit promise of continued liberty and suggests that there is no strong need to detain the petitioners before any hearing can be held, *Rodriguez Diaz* does not resolve the procedural due process question presented here.

[4] The government notes that "[w]hether the *Mathews* test applies in this context is an open question in the Ninth Circuit." Respondents' Opposition at 19 n.8. While neither the Supreme Court nor the Ninth Circuit have squarely held that *Mathews* applies to immigration detention, the Ninth Circuit has "assume[d] without deciding" that it does and applied *Mathews* to bond hearings under 8 U.S.C. § 1226(a). *See Rodriguez Diaz v. Garland*, 53 F.4th at 1206–07 (citing *Hernandez v. Sessions*, 872 F.3d 976, 993–95 (9th Cir. 2017)). Other circuits have also applied *Mathews* to § 1226(a) proceedings. *See Miranda v. Garland*, 34 F.4th 338, 358–59 (4th Cir. 2022); *Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). The Ninth Circuit has also applied *Mathews* when considering due-process challenges to removal proceedings. *See, e.g.*, *Cruz Pleitez v. Barr*, 938 F.3d 1141, 1145–46 (9th Cir. 2019); *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160–1 (9th Cir. 2004); *Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 805 (9th Cir. 2004). The Court will accordingly apply *Mathews* here.

noncitizens such as petitioners, "although indeterminate, includes many of the core values of unqualified liberty[.]" *Morrisey*, 408 U.S. at 482. Petitioners are "free to be with family and friends and to form the other enduring attachments of normal life." *Id.* The termination of that liberty would "inflict[] a 'grievous loss'" on both petitioner and his loved ones. *Id.*

The United States argues that petitioners' re-detentions are legal and mandatory under 8 U.S.C. § 1225(b)(2).[5] According to the government, petitioners have no more rights under the Due Process Clause than those that are provided to them by statute, and the relevant statute, 8 U.S.C. § 1225(b), mandates detention. The government's constitutional and statutory arguments both fail.

First, for the reasons noted above, petitioners' time and connections in this country preclude accepting any legal fiction that they remain "on the threshold" of entrance into this country. *Thuraissigiam*, 591 U.S. at 139–40. Petitioners have been in the country for approximately two years. Petitioners therefore possess liberty interests in remaining out of detention that are protected by constitutional due process requirements.

Second, and in any event, the government is wrong that petitioners are subject to mandatory detention under § 1225(b). *See* Opposition at 11. This Court has already rejected the argument that people such as petitioners, who have established connections to the United States and have been admitted, must be detained under § 1225(B). *See Pablo Sequen*, 2025 WL 2935630, at *8–*10.

Section 1225 defines a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' … as 'an applicant for admission.'" *Jennings*, 583 U.S. at 287 (quoting 8 U.S.C. § 1225(a)(1)). Section 1225(b)(2)(A) provides that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be

_____

[5] Because the requested dismissal of petitioners' pending immigration proceedings has not become final following the exhaustion of any appeals, the government has not yet placed petitioners in expedited removal proceedings pursuant to § 1225(b)(1). For that reason, the government does not contend that petitioners are currently subject to mandatory detention under that provision.

1    detained for a proceeding under section 1229a of this title." In the government's view, every

2    "applicant for admission" is necessarily "seeking admission" and therefore subject to mandatory

3    detention.

4         There are numerous problems with the government's interpretation of § 1225(b)(2). If

5    every applicant for admission was necessarily a noncitizen "seeking admission," as the

6    government suggests, then the phrase "an alien seeking admission" in § 1225(b)(2) would have no

7    meaning—it would instead read simply "the alien." *See Pablo Sequen*, 2025 WL 2935630, at *9.

8    Further, the statute's use of "seeking admission" "implies some sort of present-tense action."

9    *Martinez v. Hyde*, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025); *see also Al Otro Lado v.*

10   *Wolf*, 952 F.3d 999, 1011 (9th Cir. 2020) ("The use of the present progressive, like use of the

11   present participle, denotes an ongoing process.").

12        The government's own regulations implementing § 1225(b)(2) confirm that § 1225(b)(2)

13   refers to the class of noncitizens subject to mandatory detention by referring to them as "arriving

14   alien[s]." *See* 8 C.F.R. § 235.3(c)(1); *see also Martinez*, 2025 WL 2084238, at *6. Other

15   implementing regulations define "arriving alien" as, in relevant part, "an applicant for admission

16   *coming or attempting to come into the United States at a port-of-entry*." 8 C.F.R. § 1.2 (emphasis

17   added). Though the government argues that the implementing regulations are *not* limited to

18   arriving aliens, Opposition at 18, the regulation it cites applies only to "classes of aliens who are

19   determined to be inadmissible under section 212(a)(6)(C) or (7) of the" INA—i.e., those initially

20   found inadmissible due to fraud, misrepresentation, or lack of valid documentation. 8 C.F.R. §

21   235.3(b)(1). None of the petitioners here were deemed inadmissible on one of those grounds at the

22   time of their inspection. Both the text of § 1225(b)(2) and the relevant regulations, then, indicate

23   that § 1225(b)(2) applies only to applicants for admission who are actively "seeking admission"

24   by requesting entry into the United States upon arrival. That category does not include petitioners.

25        The use of the word "otherwise" in § 1225(a)(3) does not indicate that those who are

26   "applicant[s] for admission" are a subset of those who are "seeking admission." Section

27   1225(a)(3) says, "All aliens … who are applicants for admission or otherwise seeking admission

28   or readmission to or transit through the United States shall be inspected by immigration officers."

United States District Court
Northern District of California

8 U.S.C. § 1225(a)(3). The government has previously taken the position that "or otherwise" in §

1225(a)(3) suggests that the preceding phrase (i.e. "applicants for admission") is entirely

subsumed by the phrase that follows (i.e. noncitizens "seeking admission or readmission to or

transit through the United States"). But the government's position would misread "otherwise."

"Otherwise" generally means, "in a different way or manner" or "in different circumstances."

*Otherwise*, Webster's Ninth New Collegiate Dictionary 835 (1984). So § 1225(a)(3)'s use of "or

otherwise" simply means that immigration officers must inspect any noncitizen who is "seeking

admission or readmission to or transit through the United States," whether the noncitizen is an

applicant for admission *or* differently situated. To be sure, § 1225(a)(3) acknowledges some

overlap between the categories of "applicants for admission" and noncitizens "seeking admission,"

with the latter serving as "a 'catch-all' to describe non-citizens who *must be inspected*." *Cordero

Pelico v. Kaiser*, 2025 WL 2822876, at *14 (N.D. Cal. Oct. 3, 2025) (quoting *Al Otro Lado v.

Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1119 (9th Cir. 2025)). But that does not suggest that

either category totally subsumes the other. There may be noncitizens "seeking admission" who are

not applicants for admission. "For example, those applying for a visa at a consulate abroad would

be seeking admission but not be applicants for admission, since they are neither present in the

country nor arriving in it." *Id.* (citing *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 741 (BIA

2012)). And there are noncitizens such as petitioners who are applicants for admission but are not

currently "seeking admission" because they have already been released into the United States.

    The government's interpretation of § 1225(b)(2) is also in significant tension with other

portions of the INA. Section 1225(b)(2) requires detention of noncitizens who cannot prove to an

immigration officer that they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C.

§ 1225(b)(2)(A). Yet § 1226(c) separately requires detention for noncitizens who are

"inadmissible" on specific grounds. A noncitizen who is "inadmissible" for one of the specific

grounds laid out in § 1226(c) would by necessity be unable to make the clear showing of

admissibility required to avoid detention under § 1225(b)(2). So interpreting § 1225(b)(2) to cover

every "applicant for admission," including noncitizens subject to § 1226, would largely nullify

§ 1226(c).

11

United States District Court
Northern District of California

Perhaps most significantly, interpreting § 1225(b)(2) to encompass all "applicants for admission" would have the effect of nullifying a subsection in § 1226 added by Congress just this year. That subsection was amended by the Laken Riley Act, Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025) (adding 8 U.S.C. § 1226(c)(1)(E)), which added a specific ground on which the government must detain a noncitizen. The additional specific ground "includes noncitizens who are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C) [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one of certain enumerated crimes." *Salcedo Aceros v. Kaiser*, 2025 WL 2637503, at *10 (N.D. Cal. Sept. 12, 2025). According to the government's logic, however, the noncitizens charged with one of the enumerated crimes whose detention Congress mandated in the Laken Riley Act were already subject to mandatory detention under § 1225(b)(2) whether or not they had been so charged. The Court declines to adopt an interpretation of § 1225(b)(2) that would almost entirely negate another provision of the same statutory scheme enacted just this year. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024) ("When Congress substantively revises a statute's text, 'we presume it intends its amendment to have real and substantial effect.'" (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995))).

In its opposition, the government relies on a recent BIA decision, *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025), to argue that "based on the plain text of the statute," immigration judges "lack authority to hold bond hearings for" noncitizens who are "applicants for admission" who are also "seeking admission." Opposition at 12. In *Matter of Yajure Hurtado*, the BIA held that a noncitizen who is an "applicant admission" is necessarily "seeking admission" such that § 1225(b)(2) covers all "applicants for admission," including those who have been released into and resided in the United States for years. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. at 221–25.

Because "agencies have no special competence in resolving statutory ambiguities," "the BIA decision is entitled to little deference." *Salcedo Aceros*, 2025 WL 2637503, *9 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). Instead, the BIA's interpretation is owed deference only to the extent that "the validity of its reasoning" and "its consistency with

earlier and later pronouncements" give it "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The BIA's reasoning in *Matter of Yajure Hurtado* fails to persuade because, as explained above, its interpretation of § 1225(b)(2) needlessly renders the phrase "seeking admission" superfluous, vitiates the discretionary-detention regime created by § 1226(a), and nullifies much of § 1226(c), including Congress's most recent amendments thereto. And any persuasive work the BIA's decision might have is further undercut by its inconsistency with the BIA's earlier pronouncements:

> Prior to its September 5 decision [in *Yajure Hurtado*], the BIA issued three non-precedential decision taking the *opposite* position. In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time."

*Salcedo Aceros*, 2025 WL 2637503, at *9 (citations omitted) (first citing *Martinez*, 2025 WL 2084238, at *8; then quoting *Loper Bright*, 603 U.S. at 386).

Concluding that petitioners are not subject to § 1225 would not, as the government argues, "treat individuals who unlawfully enter the country better than those who appear at a port of entry." Opposition at 20 (citing *Torres v. Barr*, 976 F.3d 918 (9th Cir. 2020)). To be sure, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 sought to eliminate the INA's distinction between noncitizens who sought to enter the United States from a port of entry and those who were already present in the United States. *Torres*, 976 F.3d at 927–28. As the Ninth Circuit has explained, however, Congress did so by eliminating the prior distinction between exclusion proceedings (which applied to those outside the United States or those seeking admission at a port of entry) and deportation proceedings (which applied to those within the country) and instead defining all such individuals as applicants for admission subject to removal proceedings. *Id.* at 928. To the extent that petitioners are entitled to certain procedural protections not available to those currently seeking admission at a port of entry, that merely reflects the well-established principle that noncitizens in petitioners' circumstance have constitutional due process rights not available to those who remain on the threshold of entry. *See, e.g.*, *Thuraissigiam*, 591 U.S. at 107.

1    Finally, the government argues that even if the government "previously released

2    [petitioners] under 8 U.S.C. § 1226(a)," the petitioners' detention is still governed by 8 U.S.C.

3    § 1225(b). Petitioners, the government insists, "were neither admitted nor paroled, nor lawfully

4    present in this country" and, under *Thuraissigiam*, are still "treated for due process purposes as if

5    stopped at the border." 591 U.S. at 130–40. As noted already, the Court cannot accept the

6    government's legal fiction that individuals who have resided within the United States for a year or

7    more remain "on the threshold" of entrance. For all the reasons discussed above, petitioners are

8    not properly "treated for due process purposes as if stopped at the border." *Id.*

9    Accordingly, petitioners are not subject to § 1225(b)(2) and are instead subject to the

10   discretionary-detention framework of § 1226(a), which permits detention only of noncitizens who

11   pose a danger to other persons or property or are unlikely to appear for scheduled [removal]

12   proceedings." *See* 8 U.S.C. § 1226(a)(4). Petitioners' private interest in avoiding the erroneous

13   deprivation of liberty—i.e., their interest in remaining at liberty if they do not pose a danger to

14   others or a flight risk—is high. The first *Mathews* factor thus strongly favors them.

15   **B.    The risk of erroneous deprivation and value of additional safeguards are high.**

16   For the reasons noted above, petitioners are subject to § 1226 and, if re-detained, would be

17   entitled to a post-arrest bond hearing before an immigration judge. Because such a hearing would

18   only be provided after they have been detained and thereby deprived of their liberty, however,

19   there remains a substantial risk that the government will erroneously deprive petitioners of their

20   liberty by re-arresting them without first providing an opportunity for them to demonstrate why

21   their detention is unwarranted.

22   "[W]here … the petitioner has not received any bond or custody redetermination hearing,"

23   "the risk of an erroneous deprivation of liberty is high." *Singh v. Andrews*, No. 25-cv-00801, 2025

24   WL 1918679, at *7 (E.D. Cal. July 11, 2025) (citation modified). That is because "neither

25   Petitioner[s] nor Respondents had an opportunity to determine whether any valid basis exists for

26   [their] detention." *Oliveros v. Kaiser*, 25-cv-07117-BLF, 2025 WL 2677125, at *7 (N.D. Cal.

27   Sept. 18, 2025). There are only two such bases for civil immigration detention: to prevent flight or

28   to protect against danger to the community. *See Zadvydas*, 533 U.S. at 690. The government has

United States District Court
Northern District of California

14

not offered any evidence that petitioners' detention would serve either purpose. The record before the Court suggests the opposite: No petitioner appears to have a criminal record, and all have attended their scheduled immigration hearings, making it unlikely that they will pose a threat or flee. *See Jorge M.F. v. Wilkinson*, No. 21-cv-01424, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021).[6] Indeed, in order to release them on their own recognizance following their initial inspections, the government was previously required to determine that petitioners "will not pose a danger to the safety of other persons or of property and [are] likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(a)(4); *see also* 8 C.F.R. § 1236.1(c)(8).

Given the absence of any evidence justifying petitioners' detention, there is a significant risk that the deprivation of their liberty in the time between their arrest and a post-arrest bond hearing under § 1226 would be entirely unjustified.[7] Providing them with the procedural safeguard of a pre-detention hearing will have significant value in helping ensure that any future detention has a lawful basis. The second *Mathews* factor therefore also weighs in petitioners' favor.

_____

[6] The government argues that "the risk of erroneous deprivation and value of additional process is small due to the procedural safeguards that Section 1226(a) provides." Opposition at 23. But the government has taken the position that petitioners are not entitled to receive any of those procedural protections since they are subject to mandatory detention under § 1225(b)(2). And in any event, even if the procedural safeguards provided by § 1226 are constitutionally sufficient when individuals are first detained, *see Rodriguez Diaz*, 53 F.4th at 1210–12, the analysis differs where, as here, the government previously determined that petitioners posed neither a threat to the public nor a risk of flight. If anything, petitioners' lawful conduct and appearances at immigration proceedings in the time since their release strengthens that prior conclusion and suggests that additional pre-detention procedures would be valuable in determining whether there is any valid reason for their detention.

[7] If the government were correct that petitioners are subject to detention under § 1225 and not § 1226, that would if anything strengthen their procedural due-process claim. Section 1225 contains no mechanism whatsoever for an alien to challenge her detention pending removal; instead, the alien must be detained until the completion of immigration proceedings. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1136 (9th Cir. 2013) ("The risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial."). The risk that petitioners would be deprived of their liberty without any valid government justification would thus be significantly increased by any detention pursuant to § 1225. Subjecting them to expedited removal would further increase the constitutional risk because they would be denied any opportunity to prove their claims for asylum in a full evidentiary hearing or to pursue judicial review of the denial of their application. *See Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 805 (9th Cir. 2004) (holding that "the private liberty interests involved in deportation proceedings are among the most substantial" and that a noncitizen's loss of the right to seek review by the BIA and court of appeals increases the risk of error (citation modified)).

United States District Court
Northern District of California

**United States District Court**
**Northern District of California**

**C.    The government's countervailing interest in detaining petitioners without a prior hearing is at most minimal.**

Finally, the government has at most a minimal countervailing interest in detaining petitioners without first providing a hearing. *See Pablo Sequen*, 2025 WL 2650637, at *8. As this Court wrote in a similar case:

> The government may have "a strong interest" in detaining noncitizens during the pendency of removal proceedings as needed to "protect[c] the public from dangerous criminal aliens," or to prevent flight and thereby "increase the chance that … the aliens will be successfully removed." *Rodriguez Diaz*, 53 F.4th at 1208 (quoting *Demore v. Kim*, 538 U.S. 510, 515 (2003)). Here, however, the government has made no attempt to show that [petitioners are] a flight risk or a danger to the community. Nor can the government assert that providing a hearing would impose any financial or administrative burden. Because custody hearings in immigration cost "are routine and impose a minimal cost, … it is likely that the cost to the government of detaining [petitioners] pending any bond hearing would significantly exceed the cost of providing [them] with a pre-detention hearing. *Garro Pinchi*, 2025 WL 2084921, at *6 (quoting *Singh*, 2025 WL 1918679, at *8).

*Id.* The third *Mathews* factor thus also favors petitioners.

Because each of the *Mathews* factors supports petitioners' right to a bond hearing before an immigration judge prior to any re-arrest or detention, they have shown a likelihood of success on the merits of their procedural due-process claim.[8]

**II.    Petitioners will likely experience irreparable harm absent an injunction.**

The record shows that petitioners are also likely to suffer immediate and irreparable harm without preliminary injunctive relief. The government has already detained petitioners, and it released them only after this Court issued a temporary restraining order. Because the government argues that petitioners' detention would be "mandated by statute, there is little question that ICE would immediate re-detain [them] in the absence of an injunction." *Pablo Sequen*, 2025 WL 2650637, at *9.

---

[8] Because the government's likely detention of petitioners in violation of their procedural due process rights is dispositive, the Court need not address whether the government likely violated their substantive due process rights as well.

16

The likely unconstitutional deprivation of liberty that petitioners face is an immediate and irreparable harm, even if it were to last only until a post-detention bond hearing. "The loss or threatened infringement upon [constitutional] rights for even minimal periods of time unquestionably constitutes irreparable injury." *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019) (citation modified). The government argues that because "[t]he 'unlawful deprivation of physical liberty' is a harm that 'is essentially inherent in detention,'" that loss of physical liberty and its consequences cannot weigh in favor of petitioners. Opposition at 23 (citing *Lopez Reyes v. Bonnar*, No. 18-cv-07429-SK, 2018 WL 7474861, at *10 (N.D. Cal. Dec. 24, 2018)). But while the deprivation of physical liberty may be "inherent in detention," that does not mean that *unlawful* detention in violation of one's due process rights cannot cause irreparable harm. Such a conclusion would run directly counter to the Due Process Clause's core purpose of protecting "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint," which "lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. The government offers no support for its contention that this central form of liberty deserves less protection than the other interests protected by the Clause.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified). "[I]t follows inexorably from [the Court's] conclusion" that petitioners "will likely be deprived of their physical liberty unconstitutionally in the absence of the injunction … that [they] have also carried their burden as to irreparable harm." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). And in any event, the Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention," including "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. Petitioners have therefore demonstrated a likelihood of irreparable injury sufficient to justify the issuance of preliminary relief.

III.    **The balance of the equities and public interest weigh in favor of granting a preliminary injunction.**

The final two *Winter* factors—the balance of the equities and public interest—merge because the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Once again, these factors weigh heavily in favor of an injunction:

> "Because public interest concerns are implicated when a constitutional right has been violated, all citizens have a stake in upholding the Constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042 (citation modified). Further, "the Ninth Circuit has recognized that 'the costs to the public of immigration detention are staggering.'" *Jorge M.F. v. Wilkinson*, No. 21-cv-01424, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021) (citation modified) (quoting *Hernandez*, 872 F.3d at 996). "Given the low risk that [petitioners] would cause harm to others or flee, in light of [their] strong family ties … and … work commitments, such government expenditure in this case would not greatly serve the interests of the general public." *Id.* (citation modified). And in contrast to the irreparable harm that [petitioners] would suffer absent an injunction, the potential harm to the government is minimal—at most, a short delay in detaining [petitioners] if it ultimately demonstrates to a neutral decisionmaker that [their] detention is necessary. *See id.* at *3; *Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025). Moreover, the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice" implicating "constitutional concerns").

*Pablo Sequen*, 2025 WL 2650637, at *9. As in its prior temporary restraining order, the Court again concludes that the balance of equities and the public interest "weigh heavily in favor of granting" a preliminary injunction. Order Granting TRO, Dkt. 6, at 5. "[A]ny additional administrative costs to the government are far outweighed by the considerable harm to [their] constitutional rights." *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

In its opposition, the United States argues that the public interest in "the steady enforcement of its immigration laws" means that the balance of equities does not favor a

18

United States District Court
Northern District of California

1  preliminary injunction. Opposition at 24. According to the United States, because petitioners must

2  be properly detained under Section 1225(b), the statutory scheme favors denying a preliminary

3  injunction. Opposition at 24. But, again, petitioners are not properly detained under Section

4  1225(b). Protecting the procedural due process rights to which petitioners are entitled would not

5  "circumvent[] the comprehensive statutory scheme that Congress enacted" but fulfill it.

6  **IV.     The Parameters of the Pre-Detention Hearing**

7        Prior to any future detention by ICE, petitioners are entitled to notice and a pre-deprivation

8  hearing at which a neutral arbiter must determine whether there is any valid basis for their

9  detention—i.e., whether they post a threat to the community or a flight risk that can only be

10  mitigated through detention. Petitioners argue that, at such a hearing, the government should bear

11  the burden of establishing by clear and convincing evidence that a valid basis exists for their

12  detention. As they note, the Ninth Circuit held in in *Singh v. Holder* that "the government must

13  prove by clear and convincing evidence that an alien is a flight risk or a danger to the community

14  to justify denial of bond." 638 F.3d 1196, 1203 (9th Cir. 2011).

15        Contrary to the government's argument, the Ninth Circuit's decision in *Rodriguez Diaz*

16  does not mean that *Singh* and other related decisions "are 'no longer good law' on this issue."

17  Opposition at 25. *Rodriguez Diaz* rejected a habeas petitioner's argument that he was entitled to a

18  second bond hearing after a lengthy period of detention because the government had not had the

19  burden of proof at his initial bond hearing under § 1226(a). The Ninth Circuit concluded that the

20  Fifth Amendment did not require the government to prove a valid basis for detention by clear and

21  convincing evidence at the initial hearing because the statutory framework provided the petitioner

22  with "extensive procedural protections" in other respects, "including several layers of review of

23  the agency's initial custody determination, … the opportunity to be represented by counsel and to

24  present evidence, the right to appeal, and the right to seek a new hearing when circumstances

25  materially change." 53 F.4th at 1210–12.

26        *Rodriguez Diaz* addressed circumstances entirely different from those presented here, in

27  which the government contends that petitioners are not entitled to procedural protections available

28  following a denial of release under § 1226(a), petitioners face a high risk that they are being

erroneously deprived of their liberty, and the government previously determined that petitioners do not pose a threat to the community or a flight risk. *Rodriguez Diaz* itself recognized that greater protections may be constitutionally necessary in individual cases where the risk of erroneous deprivation of liberty is particularly high. *See id.* as 1212–13. That rule applies here, and the constitutional principles announced in *Singh*, not those considered in *Rodriguez Diaz*, govern. Under that precedent, the government must establish a valid basis for petitioners' detention by clear and convincing evidence.

## CONCLUSION

For the above reasons, the Court grants a preliminary injunction to Sebastian Chavarriaga Rojas, Maria Camila Gomez Vasquez, Leon Felipe Hernandez Leal, and Julian David Carvajal Mendoza. The government may not detain petitioners during the pendency of proceedings without providing them with pre-detention bond hearings before a neutral immigration judge. The government may detain petitioners only if, at such a bond hearing, the government bears its burden of demonstrating by clear and convincing evidence that petitioners are a danger to the community or flight risks and that no conditions other than detention would be sufficient to prevent such harms.

**IT IS SO ORDERED.**

Dated: December 22, 2025

_____
P. Casey Pitts
United States District Judge